The following is the case, as substantially settled by the Judge presiding, the counsel for the parties litigant being unable to agree upon the facts.
The land sought to be divided was known as "The Thomas Hearne gold mine tract," and was situate in Stanly county.
The petition was originally filed before the Superior Court Clerk of Stanly county, and upon the coming in of the answer, denying the right of the plaintiffs and alleging sole seizure in the defendants, the cause was transferred to the Civil Issue Docket, to be tried at Term, and was subsequently, by order of the Court, on affidavit filed, removed for trial to Union Superior Court. Previous to the order of removal, upon application, the defendants were allowed to file an amended answer, *Page 614 
setting forth in detail the grounds of defence and of their title to the whole of the land. The plaintiffs rely upon the general replication.
On the trial below, an issue was proposed by the plaintiffs in these words:
"Are the plaintiffs and defendants tenants in common of the realty in the pleadings mentioned?"
The proposed issue was objected to by the defendant, as being too general — they having set out their title specifically. It was also objected to, on the ground that it was a compound of law and fact; and in lien thereof, the defendants proposed six distinct issues, which, by direction of the Court, were submitted to the jury; and as the trial progressed, at the suggestion of the plaintiffs, two other issues were added. These eight issues were submitted in all, the first six at the instance of the defendants, and the remaining two as suggested and at the instance of the plaintiffs. The whole series, together with the finding of the jury on each, is hereinafter set forth at length. Upon the rendition of their verdict both plaintiffs and defendants claimed the judgment of the Court.
His Honor, after full argument and consideration, came to the conclusion that the finding by the jury of the seventh issue in the affirmative, was decisive of the case against the defendants; and that it was really immaterial after that finding, whether the defendant, Thomas J. Crowell, had paid for the whole of the lands or not; or whether he was the owner of the whole or not, at the time the plaintiffs purchased at the sheriff's sale, or whether he intended to induce the plaintiffs to bid or not, or whether the plaintiffs were misled and deceived or not? Since, by that finding it was established that the defendant, Thomas, was present at the sale and directed and assented to the sale of one half of the land as the property of Thomas Stokes; so that now he has estopped in pais from claiming, as against the purchasers, more than one half of the property, although he was in fact the owner of the whole.
It was thereupon adjudged by the Court, that the plaintiffs *Page 615 
and the defendants were tenants in common of the realty mentioned in the pleadings — the plaintiffs being entitled to one-half, and the defendants to the other half — saving the life interest of Caroline Hearne, the widow of Thomas Hearne, in that part of the land of which she is in possession, and of which neither party seeks to deprive her. The decision of the Court being announced, the defendants after excepting thereto for error, next moved for a rule for a new trial and venire denovo, alleging error by the Court during the progress of the trial.
ABSTRACT OF TITLE.
Both parties claimed title under one John S. Pennington, who had acquired the legal estate by deed, pursuant to purchase at the Clerk and Master's sale in 1867, of the lands of Thomas Hearne, deceased, sold under a decree of the Court of Equity of Stanly county, for partition among the heirs.
Plaintiffs' Title: The plaintiffs read in evidence the record of a judgment, in a suit in the Superior Court of Law of Stanly county; ThomasStokes v. John S. Pennington, wherein judgment was rendered at Spring Term, 1868, on the 2nd March, for $5,808.07. Execution issued and was levied on Pennington's interest in this land. Ven. Ex., and return of sale thereunder, to Thomas Stokes as highest bidder, at the price of five dollars ($5,) on the 1st Monday in April, 1868; also a deedof [deed of] Joseph Marshall, sheriff, to Thomas Stokes, dated 19th September, 1868, for one-half of said land. The plaintiffs next read in evidence, records of sundry judgments, c., against Thomas Stokes, viz.:
1. In case of Luke Blackmer and wife, Judith: Judgment in a Justice's Court of Stanly county for $74.45; docketed in the Superior Court, 6th of April, 1870. Execution levied 30th May, 1871, on Stokes' interest in said land.
(2.) In case of A. Miller, to the use of J. A. Miller v. Thomas Stokes, judgment in Justice Court of said county, for $135.50; docketed in the Superior Court, 29th March, 1870. *Page 616 
Execution levied 30th May, 1871, on Stokes' interest in said land.
(3.) In case of Mauny, McAllister McCanden, (the said Mauny being V. Mauny, one of the plaintiffs,) v. Thomas Stokes; judgment in the Superior Court of Stanly, at Fall Term, 1870, for $432; docketed 19th September, 1870. Execution levied 30th May, 1871, on Stokes' interest in said land also.
Record of sale to the plaintiffs, by the sheriff, on the 1st July, 1871, under the foregoing executions and levies; and deed of Joseph Marshall, sheriff, to the plaintiffs, dated 12th July, 1871, for the whole of said land, known as "the Thomas Hearne Gold Mine tract," for the sum of $1,600.
Defendants' Title: The defendants read in evidence a deed from Caroline Hearne, widow of Thomas Hearne, to John S. Pennington, dated 20th August, 1867, conveying to him for the consideration of $100, her entire interest as widow, to the dower land, excepting a life interest in the houses, barns and such farming land, as may not interfere with searching for gold. Upon which deed was an assignment endorsed, from John S. Pennington to defendant, Thomas J. Crowell, thus: "I assign over the within deed to T. J. Crowell, on the same day and date within written."
Also, a deed from said Caroline Hearne to Thomas J. Crowell, dated 6th July, 1872, conveying to him, in consideration of $100, her said dower interest with like reservation. This last deed, it was insisted by defendant, was intended to supplement the preceding deed and render effectual the assignment endorsed thereon; for the reason that Thomas J. Crowell had, through the agency of Pennington, paid the purchase money to the widow. There was evidence tending to show that such was the case.
The defendants next read in evidence, articles of agreement under seal, executed by John S. Pennington to defendant, Thomas J. Crowell, dated 1st February, 1868, wherein Pennington agrees to convey to Crowell one half of this land, *Page 617 
upon payment of one half of the purchase money to him, or to the Clerk and Master, so that each pays half of the purchase money.
Also, the defendants read a deed from said Pennington and wife to said Crowell, dated 21st March, 1868, upon the consideration of $600, conveying one half of said land, the 406 acres, bought of the Clerk and Master.
By these two instruments, last mentioned, it was insisted by the defendants, that Thomas J. Crowell had acquired the equitable title to one half of the land, and the legal title to other, from John S. Pennington, who had obtained the legal title to the whole from the Clerk and Master, under an arrangement between Pennington, Crowell and others, that the land should be bid off by Pennington, and owned by such of them as paid for it; and that Crowell had paid all the purchase money, and so was entitled to the whole interest in the land. There was evidence tending to prove these positions taken by the defendants.
A contrary view was presented by the plaintiffs, who controverted the payment of the entire purchase money by Crowell, and argued that the deed from Pennington to Crowell for one half of the land, was intended to carry out the articles of agreement; and that the other half interest remained in Pennington, and had been sold under execution and bought by Thomas Stokes, and then been sold under execution as Stokes' property, and been bought by the plaintiffs.
The defendants' exceptions to evidence:
The defendant Crowell, was examined on the part of the defence, and swore substantially to the facts set forth in his answer. He stated, in his testimony, that he had himself and through John S. Pennington, as his agent, and with his funds, paid the Clerk and Master in full, the purchase money for "the Thomas Hearne Gold Mine tract," which Pennington had bid off on joint account, under an agreement that the title was to be made to those who paid for it — Pennington acting as bidder and giving the note, upon which Crowell was security. *Page 618 
That after the note was paid by Crowell, he asked of the Clerk and Master a title for the land, and that Pennington directed the Clerk and Master to make a deed to Crowell; but he declined so to do, because Pennington had been reported to the Court as the purchaser, and was the proper person to receive the deed, which was accordingly made to him. That he, Crowell, had forbidden the sale, when the property was levied on and sold as the property of Pennington; that he had consulted S. J. Pennington, Esq., one of the plaintiffs, and an attorney residing at Albemarle, in regard to his title, and shown him his title papers, and had been advised by him, that he had a good title to the whole of the land. He, Crowell, denied that he had ever admitted that he claimed but half of the property, or that he had directed sheriff Marshall to sell half of it, as the property of Stokes, or that he had ever assented to such sale; but admitted, that at the sale made by sheriff Marshall, as the property of Stokes, under executions, when the plaintiffs purchased, that he had himself bid $1,500, for the purpose of quieting his title, as he wanted to make sale, but could not do so while Stokes' claim was out. That the plaintiffs had attempted to take forcible possession, and that he had successfully resisted them. This defendant also admitted, that he and Thomas Stokes and Monroe N. Lord, of Chicago, had entered into a contract respecting said lands, and that he and Stokes united this tract and a tract of Stokes' adjoining, in order to effect a sale of the whole.
Upon the cross-examination of this witness, Thomas J. Crowell, the defendant, the plaintiffs' counsel handed him a paper writing and asked him if that was a copy of the contract between him and Stokes and Lord, which he had furnished to V. Mauny, one of the plaintiffs? The witness replied, that he had given Mauny a copy of the contract, but that he could not say whether this was the paper or not. Whereupon, V. Mauny, one of the plaintiffs, was called to the witness stand, by the plaintiffs' counsel, and testified that Thomas J. Crowell, the defendant, handed to him this identical *Page 619 
paper writing, and informed him that it was a true copy of the original contract entered into by Stokes, Crowell and Lord.
The plaintiffs' counsel then proposed to read it in evidence, informing the Court that they intended to rely on it, as an estoppel in deed, under the hand and seal of the defendant.
The defendants' counsel objected to the reception of the pa per writing in evidence, upon the ground that it was only a copy, and that no notice had been given to produce the original.
The plaintiffs' counsel then proposed to read it in evidence, as a mere declaration of defendant, Crowell, to the effect, that he and Stokes were jointly interested in this particular land.
The counsel of the defendants renewed their objection, and opposed the reading of the paper for any purpose.
His Honor ruled that while the paper writing in question, could not have the effect in law, of an estoppel by deed, yet although a mere copy, it was rendered competent evidence by the testimony of Mauny, of any admissions made therein by defendant Crowell, which ought to go to the jury, along with the explanation he had given in his testimony. The copy was accordingly read, and the defendants excepted. The following is a synopsis of its contents.
It was a copy of a contract under seal, signed by Thomas Stokes, T. J. Crowell and M. N. Lord, on the 20th April, 1871, for the purpose of forming a joint stock company for mining purposes — the capital stock to be $29,000. This tract of 400 acres described as property of which Thomas Stokes and T. J. Crowell are joint owners, is put into the concern at a valuation of $15,000; also another tract adjoining, belonging to Thomas Stokes, or the mining part thereof, being the S.W. corner, is to be deeded or leased for ninety-nine years, reserving to Stokes a certain royalty; also another tract adjoining, jointly owned by Stokes and Lord, is put in at a valuation of $10,000. Lord is to put in $3,000 cash, and Crowell is to put in a steam engine at $1,000, the expressed purpose being *Page 620 
to consolidate said lands with a view of working the gold ores, and doing a general mining and mechanical business upon said property.
S. J. Pemberton, one of the plaintiffs, was offered as a witness for the plaintiffs, and was asked by their counsel to state a conversation he had with the defendant Crowell in reference to this land.
The defendants counsel objected on the ground that S. J. Pemberton was an attorney at law, and had been consulted professionally by Crowell, so that the conversation alluded to, came within the class of privilege communications, and was inadmissible. Upon his preliminary examination, Pemberton stated that he never had been employed by Crowell to investigate his title, nor did he consider him his client, nor had he ever received a fee from him about this matter. That between the 15th and 18th of April, 1871, Crowell submitted to him two documents, viz: the articles of agreement between Pennington and Crowell, dated 1st February, 1868, and the deed from Pennington and wife to Crowell, dated 21st March, 1868, and made his statement in regard thereto, and said that he wanted my legal opinion, and an abstract of his title for M. N. Lord. I gave him my opinion, but no abstract. Upon this statement of the case, the plaintiffs' counsel insisted they were entitled to the opinion that Pemberton gave to Crowell for said Lord. To this the defendants objected, but his Honor thought the evidence competent, especially as Crowell, when examined, had given his version, and admitted the evidence.
Pemberton then stated: "I told Crowell he had a good title to one-half of the land; I made no abstract." The defendant again excepted.
These were all the points made by defendants counsel; but inasmuch as they are desirous that certain portions of the evidence of plaintiffs, Pemberton, Blackmer and Mauny, should be set out and accompany the case, it is accordingly subjoined.
S. J. Pemberton, one of the plaintiffs testified that on the *Page 621 
day on which Stokes' property was sold by the sheriff, and previous to the sale, that Crowell agreed that one half of the Hearne property might be sold as Stokes' property; and that Luke Blackmer, one of the plaintiffs in the executions, and attorney for the rest, agreed that only one half should be sold as Stokes' property; and that Crowell was present at the sale, and directed sheriff Marshall to sell but one half; that the sheriff announced at the sale, that it was agreed by all parties that Stokes' interest was one half. When the sale was commenced, V. Mauney started the bid at $400. Crowell run it up to $1,500, and it was knocked down to Mauny at $1,600, Mauney bidding in behalf of the plaintiffs, to whom the sheriff's deed was made.
The sheriff's deed to us, was drawn by myself, and called for Stokes' interest, not specifying one-half. This was done at Blackmer's suggestion, in case Crowell's title should not be good for the other one-half.
It should be added, that Pemberton further stated, that he had no connection with this matter until the morning of the sale, after it was agreed all around that Stokes' interest was one-half; that Stokes owed him $1,000, not reduced to judgment, and he hoped thus to save the debt. That the plaintiffs had all agreed before the sale, that if Stokes interest could be sold for more than was due them, that he, Stokes, should have the surplus; and if they bought the property, and it could be so managed, by carrying out the Lord contract, or otherwise, to realize more than enough to pay them, that Stokes (who is now dead,) should have the benefit of it. That the witness, Pemberton, was Stokes general counsel, and not the counsel of Crowell.
Luke Blackmer, one of the plaintiffs testified: That the defendant, Crowell, was present at the execution sale of Stokes' property, and assented to, and directed the sheriff to sell one-half of "The Thomas Hearne gold mine tract," as Stokes' property.
On his cross examination, Blackmer stated he was an attorney *Page 622 
at law; that he was aware of Crowell's title before the sale, and had been informed by Pemberton, that it was good for one-half of the property; that he himself had confidence in Stokes' title, and had told Crowell on the day of the sale, that his title was not good, and that unless he consented to a sale of one half, as the property of Stokes, that the whole would be exposed to sale by the sheriff; that Crowell did so consent, and the sale took place that way. That he came from Salisbury for the purpose of attending the sale at Albemarle, to make the property sell for enough to pay off the executions. That the plaintiffs were not induced by anything Crowell said or did to bid for the property at the sheriff's sale. The only difference was, that if Crowell had not consented to the sale of one-half, this suit would have been brought for the whole of the land instead of one-half.
V. Mauney, one of the plaintiff's testified: That he was present at the first execution sale, when the property was sold by the sheriff, as the property of John S. Pennington, when Crowell was present and forbid the sale, claiming the land as his individual property. On the day of the second sale, as Stokes' property, and before the sale, Crowell consented that half the land might be sold as Stokes' property, he himself, claiming but one-half. The sheriff announced, after Crowell had spoken to him, that it was agreed among the parties, that he should sell one-half thereof as Stokes' property. The witness remarked at the time, "Yes, whoever bought it, would get an undisputed title." He, the witness, bid $400, Crowell $500, and then he, Crowell, and the witness bid against each other, until he bid $1,500, and the witness $1,600, whereupon it was knocked off to him. The bid was for the benefit of the witness and the other plaintiffs.
Plaintiffs' exceptions to evidence, c.
The plaintiffs, as a matter of precaution, in case the judgment in their favor should be reversed, and in order in that event, judgment may not be rendered for the other side, without further hearing, desire that their exceptions taken during *Page 623 
the trial, may be entered of record for the purpose of review. (These exceptions relate expressly to, and properly form part of the record in the succeeding case, being an appeal by the plaintiffs, the same parties defendants.
(1.) During the examination of the defendant, Crowell, he stated that he received a letter from Thomas Stokes, dated 24th December, 1870, which he held in his hand. The defendants' counsel requested that it might be read in the hearing of the jury, as it related to the land, and was written at a time when Stokes, under whom the plaintiff claimed title, claimed to be a part owner, by purchase of Pennington's interest, and sheriff's deed therefor, dated 19th September, 1870.
Plaintiffs objected; objection overruled, and letter read. It contained an admission that T. J. Crowell owned a three-fourths interest in this land.
(2.) During his examination, Crowell produced a statement of an account of payments made by him for the land in dispute, in the handwriting of J. S. Pennington, and written about the 1st of February, 1868. This statement showed the proportion which each of them, (Crowell and Pennington,) ought to have paid, and what Crowell actually paid. This statement was offered as corroboratory to the evidence of Crowell, that he had paid the money for the land to the Clerk and Master, previous to the deed of Pennington and wife to him, dated 21st of March, 1868.
To this plaintiffs objected; objection overruled and plaintiffs excepted.
(3.) At a subsequent period of the trial, the plaintiffs called to the attention of the Court an erasure made in the statement of account of payments, admitted in evidence, which erasure was made by abrasion of the paper and materially altered the sense of the writing. If it had not been made, the paper would show that Crowell was then indebted to Pennington in a considerable sum. Thereupon Crowell was re-called and interrogated as to the erasure. He swore he never noticed *Page 624 
the erasure until it was called to his attention during the trial, and did not know how it occurred.
His Honor was asked to withdraw the statement from the consideration of the jury. This he declined to do, but informed the counsel that it was a proper subject for comment, and they might comment upon such erasure before the jury. Plaintiff again excepted.
(4.) H. C. Crowell, a son of the defendant, Thomas J., was examined on behalf of defendants. He was the subscribing witness to the articles of agreement of 1st February, 1868, executed by John S. Pennington to T. J. Crowell. He stated that he witnessed the execution of the paper writing of February 1st, 1868, by John S. Pennington; that it was done at his father's house. Here the counsel for the defendants proposed to give in evidence the conversation which occurred between Thomas J. Crowell and John S. Pennington, on that occasion. To this the plaintiffs objected, on the ground that the paper ought to speak for itself. His Honor admitted the evidence, and the plaintiffs again excepted. The witness then proceeded: That Pennington said to his father, that he, Crowell, had paid the money — the whole of it; and that he, Pennington, would make him the title; but that if Crowell would give him, Pennington, time to make the money, he would like to have an interest in the lands. To this Crowell replied, that he would give Pennington a showing, of course. Pennington wrote an agreement then and there, to convey one half.
(5.) The plaintiffs had exhibited in evidence the record of the suit in the Superior Court of Law of Stanly county, between Thomas Stokes as plaintiff and John S. Pennington as defendant. Judgment Spring Term, 1868, (2d March, 1868,) in favor of the plaintiffs for $5,008.07; the execution (Fi. Fa.) levied on Pennington's interest in this land now in controversy; and the ven. ex., and the return of sale endorsed thereon, made to Thomas Stokes as highest bidder, on the first Monday in April, 1870, at the price of $5.00; also the deed *Page 625 
of Sheriff Marshall to Stokes, dated 19th September, 1870, with the usual recitals, for Pennington's interest in said land, being one-half.
The defendants proposed to contradict the return of Sheriff Marshall by the evidence of a witness, one Bennett Russell. To this the defendant objected, on the ground that such testimony was incompetent thus to contradict record evidence. His Honor held that the return of the sheriff was not conclusive, but mere prima facie evidence of the facts stated in the return. The Court overruled the objection, and the plaintiffs again excepted.
Russell being then admitted to testify, stated: That he was present at the sale of Pennington's interest in this land by the sheriff, and heard Crowell forbid the sale. The sheriff proceeded with the sale, and he, the witness Russell, bought the same at $5.00. He bid for himself and no one else, and was not aware that a deed had been made to Stokes. That he applied to the sheriff for a deed, but was informed that he was too late; that if he had applied six months sooner, he, the sheriff, would have made it to him. The witness did not pay the money, as he thought the title was no account. Plaintiff excepted.
Under the direction of his Honor, the case was submitted to the jury upon the following issues, to which are appended their several findings.
1st. Did John S. Pennington purchase the lands (in controversy,) at the Clerk and Master's sale, as agent of Crowell and others, with the understanding that the land should belong to Crowell until the other parties paid their respective parts? Answer, "Yes."
2nd. Was the land paid for by Crowell? Answer, "Yes."
3rd. Was the dower interest of Caroline Hearne, except the part reserved by her, purchased by Pennington for Crowell and paid for by Crowell's money? Answer, "Yes."
4. Was Thomas Stokes the purchaser at sheriff's sale, of the interest of J. S. Pennington? Answer, No. *Page 626 
5. Was it the intention of the defendant Crowell to induce plaintiffs to bid for the property, or interest of Stokes at sheriff's sale? Answer, No.
6. If so, were the plaintiffs thereby mislead and deceived to their prejudice? Answer, No.
7. Was the defendant present at the sheriff's sale on the 1st of July, 1871, and did he direct and assent to the sale of one-half of the Hearne land as Stokes' property. Answer, Yes.
8. Did the defendant on the 20th April, 1871, enter into an agreement in writing under seal, with Thomas Stokes and one Lord, in which the defendant Crowell and Stokes mutually agreed with each other that they were part owners? Answer, Yes, in order to effect the sale of the two mines.
There was judgment in favor of the plaintiffs and thereupon the defendants appealed.
The plaintiffs did not appeal from the judgment, but did appeal from the rulings of his Honor, excepted to and noted above. As the facts in the two appeals are stated substantially alike in the settlement of the cases, the appeal of the plaintiffs will not be reported at length.
When the defendant Crowell paid the Clerk and Master for the land in question, which was bid off by Pennington for himself and the defendant and others, under the agreement set forth, it invested the defendant with theequitable title; the legal title being in Pennington by reason of his having bid off the land and taken the deed to himself. And when Pennington made the defendant a deed to one half interest, and an obligation to convey the other half, it vested in the defendant the legal title to one half, and the equitable title to the other half. And when Pennington bought the widow's dower in said land for the defendant, and paid defendant's money for it, but took the deed to himself, and endorsed the *Page 627 
deed over to the defendant, it vested in the defendant the equitable interest in the widow's dower. So that, substantially, as we now administer equities, the absolute title to the whole land was in the defendant, he having the right to call upon Pennington for the legal title.
When, subsequently, the land was sold under an execution against Pennington, the purchaser Stokes got only the title which Pennington had — even supposing that Stokes was the purchaser, which the jury found he was not. And when the plaintiffs bought at execution sale Stokes' interest, they bought only what interest Stokes had, which we have seen was nothing substantial.
Admitting this to be so, still the plaintiffs say that when they bought at Stokes' sale the defendant was present, and represented to the plaintiffs that Stokes had an interest of one-half in said land, and consented to the sale of it; and therefore the defendant is estopped to deny the plaintiff's title to one half of the land, and that the plaintiffs are tenants in common with the defendants.
In order to create an estoppel in pais it must appear:
1. That the defendant knew of his title.
2. That plaintiffs did not know and relied upon the defendant's representations.
3. That the plaintiffs were deceived. And some add a fourth requisite, that the defendant intended to deceive. But it is not necessary to decide that in this case, as all the other requisites are wanting. First, the defendant did not know of his title. He knew he had paid for the land and that he ought to have the title; but he did not know the legal effect of his papers. And therefore he consulted the plaintiff Pemberton, who was a lawyer, and was advised by him that his title was only for one half. The plaintiff, Luke Blackmer, who is also a lawyer, after consultation with Pemberton, told the defendant that his title was for one half only.
Secondly: The plaintiffs did not rely on the defendant's declarations. On the contrary, Blackmer swears that "the *Page 628 
plaintiffs were not induced by any thing that Crowell said or did to bid for the property at the Sheriff's sale. The only difference was, that if Crowell had not consented to a sale of one half, this suit would have been brought for the whole."
From the testimony of Pemberton and Blackmer it clearly appears that they investigated the matter for themselves, and that the defendant put them in possession of the facts upon which he claimed title; and that he did claim it, and that it was only upon their assurance to him that his title was not good, that he consented to a sale of one half. It was not that they relied upon him, but it was he that relied upon them.
Thirdly. The plaintiffs were not deceived by the defendant. He acted with open fairness throughout. He had writings to show for it. He thought his writings sufficient. The plaintiff's lawyers thought they knew better. Finding a defect in the title at law, they overlooked the fact that equity would supply the defect. And they excited the defendant's fears, that if he did not consent to a sale of one-half he might lose all. They deceived him. And the fact stated by Pemberton in his testimony that after the defendant had consented to a sale of one-half, and the sheriff proclaimed that only half was sold, yet he, Pemberton, "drew the deed and called for Stokes' interest, not specifying one-half." "This was so done at Mr. Blackmer's instance in case Crowell's title should not be good for the other half," shows the spirit with which they were pursuing the defendant. And it shows that while they intended that the defendant should be estopped by the sale, yet the estoppel should not be mutual; but they would so draw the deed as to enable them to claim not only the half which they bought, but the other half which they did not buy.
The other matter set up by the plaintiffs as an estoppel, to wit, the written agreement between the defendant and Stokes and Lord, cannot avail them. It was not for the purpose of passing the title to Stokes, or to have him believe that it was, but to form a partnership for mining purposes in that and in certain lands which Stokes put in. *Page 629 
What we have said disposes of the case and makes it unnecessary that we should notice the other exceptions on either side, because taking the verdict upon the issues and the testimony of the plaintiffs themselves, it is clear that the plaintiffs have no substantial interest in the land, and that the defendants are sole seized.
There is error. Judgment reversed and judgment here for the defendant.
PER CURIAM. Judgment reversed.