S. H. LOFTIN v. S. T. CROSSLAND and wife.

*Agency—Advancements of Agricultural Supplies—Estoppel—Fraud—Husband and wife—Lien—Married Women.*

1. While coverture is no protection to the wife against responsibility for torts, or positive acts of fraud voluntarily committed, all the elements necessary to create an operative estoppel will be more stringently required when the doctrine is sought to be enforced against a married woman than against those who are under no legal disabilities.

2. The constitution of the husband the agent of the wife for the purpose of leasing her lands, confers no authority upon him to subject her rents to the lien of advancements of agricultural supplies made to her tenant, to enable him to make the crop, by one who believed the lands belonged to the husband and agent, if she did nothing to produce such belief or otherwise mislead the parties to the transaction.

(*Devereux* v. *Burgwyn*, 5 Ired. Eq., 351; *Holmes* v. *Crowell*, 73 N. C., 613; *Exum* v. *Cogdell*, 74 N. C., 139; *Boyd* v. *Turpin*, at this Term; *Burnett* v. *Nicholson*, 86 N. C., 99, cited and approved, and *Blackwell* v. *Parish*, 6 Jones Eq., 70, cited and distinguished).

This was an ACTION TO RECOVER POSSESSION of certain crops raised on land belonging to the *feme* defendant, and was tried before *Avery, Judge,* at November Term, 1885, of LENOIR Superior Court.

The plaintiff claimed title to the property sued for, under a lien bond, hereinafter set forth, executed by one N. L. Hemby, who had rented certain lands from the defendant S. T. Crossland for the year, 1883, and by the said S. T. Crossland, to secure him for the advancement of certain agricultural supplies to be used in the cultivation of a crop on said land during said year. The *feme* defendant also claimed them as rents due for the use and occupation of the lands by Hemby for said year, asserting title to said land, and that the same was rented by S. T. Crossland as her agent to Hemby, and that the said S. T. Crossland had no authority to execute the said lien bond. The plaintiff insisted that S. T. Crossland did have such authority, and if this were not so, the *feme* defendant was estopped by her conduct to deny the validity of the plaintiff's claim under the lien.

The said N. L. Hemby, a witness for the plaintiff, testified that he rented a tract of land from the defendant S. T. Crossland for the year, 1883; that Crossland and the other defendant, his wife, were living on the land at the time, to-wit: in December, A. D. 1882; that both defendants were present when the land was rented; that they were both living thereon and gave witness one room in the dwelling which they occupied, which he took possession of and occupied till they left some three weeks thereafter and removed to the town of Kinston; that during this time, witness was getting ready to cultivate the land as a farm; that the renting was talked about by witness and the defendant S. T. Crossland in the presence of his wife, nearly every day; that witness asked plaintiff to furnish what agricultural supplies he might need for the year 1883 in the cultivation of said land, who said he would do so if the defendant S. T. Crossland would sign a "lien bond" on the products to be raised on the land for

the year 1883, in order to secure him; that S. T. Crossland did sign said bond, together with Hemby; that about a week before the execution of the said bond, it was agreed between the parties that it should be executed, and upon the faith of this agreement, the plaintiff advanced to the said Hemby the sum of $40 to pay S. T. Crossland for some cotton seed belonging to his wife, and which he had agreed to sell Hemby on her account, for use on the land for the year 1883, which sum was then and there paid to S. T. Crossland; that at the suggestion of the plaintiff, the bond was not executed till about a week afterwards; that witness made no crop during said year except on this land; that he heard the *feme* defendant say during the year that she supposed the plaintiff would have to pay for his advances before she got her rent; that she went out several times to the land during the year, and on one occasion in September, 1883, said that she thought that there would be enough produce raised to pay the plaintiff and herself also; that she supposed that he would get pay for his advances before she got her rents, and if there was not enough to satisfy her too, she would have to make some arrangement to wait on witness; that she was on the land one Sunday after three or four bales of cotton had been picked, and witness delivered three of said bales to the plaintiff; that after their delivery, the *feme* defendant took possession of all the balance of the crop and hauled it away; that plaintiff advanced to witness under said bond, the full sum named therein, to-wit: $400, of which witness paid $132.37.

Upon cross-examination, he stated that he first heard of the *feme* defendant's claim to the land when he delivered the three bales of cotton to the plaintiff in November, 1883; that he heard the *feme* defendant say that her husband told her he would have to sign a lien bond with witness; that he heard him tell her the day after he got the $40 for the cotton seed, that he had gotten it, and that he would have to sign a lien bond on the crops raised on the land to the plaintiff for supplies, and that she did not object; that he did not know it was her land; that S. T. Cross-

land agreed with plaintiff to sign away his interest in the rents; that he heard the *feme* defendant and his, (witness's), wife talking about the matter the day after S. T. Crossland received the $40.

The defendant S. T. Crossland then testified on behalf of the *feme* defendant: that the witness Hemby came to the house of witness to rent land, and said that he would give the witness eight bales of cotton as rent; that the witness said he would not take it, and it was finally agreed that he would give ten bales: that the *feme* defendant said she was willing for the place to be rented at that rent; that Hemby then said he wanted some cotton seed that were there; that the *feme* defendant said that she was willing to sell the seed if he would pay her for them; that Hemby then said that he had made arrangements to get his supplies; that they came to Kinston, and Hemby told witness he could not get money to pay for the cotton seed unless witness would sign the lien bond; that witness thereupon did sign it on the same day; that he at first hesitated, but signed it upon the assurance of the plaintiff that if he did so, he, plaintiff, would let Hemby have what supplies he wanted; that witness had left his wife at home; that he afterwards told her he had signed it, and she told him he ought not to have done so; that she had not authorized him to sign any paper; that she had told him he could rent the land for her, but he must not sign any paper or give any lien.  It was admitted that the land belonged to the *feme* defendant.  This witness further testified that he did not tell Hemby it was his land and that he was renting it as his property.

Upon cross-examination, he testified that he was married to the *feme* defendant in the year 1877; that he rented it as her land, but that he did not tell Hemby so; that Hemby never asked him whose land it was; that he had heard Hemby speak of the land as belonging to his wife before that, but that he could mention no time nor place; that Hemby had rented an adjoining tract of land from one Hill, and that witness had fre-

quent opportunities to talk, and did talk with Hemby; that they merely spoke of the ownership of different tracts of land in a general way; that he heard Hemby, speaking of this land, say his wife "had a good place." Witness could not say whether it was spoken before or after the renting by Hemby; that witness had been in the habit of renting said land before the renting to Hemby; that he would rent it in his own name and would afterwards tell his wife about it.

The *feme* defendant then testified in her own behalf: that she was present when the land was rented; that she told her husband she thought ten bags was enough for the place; that she had told her husband never to sign any liens or bonds; that she knew nothing of the lien bond in question till after she moved to Kinston; that she then said to her husband, "I am surprised at you, I told you never to do anything of the kind;" he said he supposed there would be enough for both; that witness had always told her husband never to give any liens on her part of the crop; that witness went out to the farm a good many times during the year 1883; that she said to Hemby, "I suppose the plaintiff must have his pay first;" that she had found out that plaintiff was getting cotton from the place and made this remark for that reason, supposing he must have a right to take it.

This witness further testified that she had no such conversation as the witness had testified to, out in the country, about the lien bond, and that she did not know of it till after she moved to Kinston; that she heard her husband had gotten pay for the cotton-seed, and as soon as he got back home on the day he received it, but that she did not know how much.

The plaintiff then testified in his own behalf: that Hemby came to him in Kinston, in December, 1882, and wanted advancements to be used on the land which he had rented for the next year from the defendant S. T. Crossland; that Hemby and Crossland came together soon thereafter, and talked about the bond, and witness paid Crossland $40 for the cotton-seed, at Hemby's request; that before the $40 was paid, it was agreed that they

should come back after the 1st of January next thereafter and sign the lien bond; that witness did not know that the lands belonged to the *feme* defendant; that she never notified him that she would not agree to that lien and not to make advances thereunder; that she was in his store in Kinston in the fall of the year 1883, but that he did not recollect what she talked about; that he always thought the land belonged to S. T. Crossland, and had always heard it called such till that Fall.

Upon this evidence the Court instructed the jury that the title to the land in controversy being admitted to be in the *feme* defendant, there is no testimony that the husband, as agent of the wife, was empowered to execute the lien to the plaintiff, nor is there any testimony to estop the wife from denying the validity of said lien and the right of the plaintiff to seize her rents by virtue of it; and further, that the jury must find all issues in favor of the defendants, which they did accordingly.

The plaintiff excepted; judgment for defendants; appeal by plaintiff.

The bond was as follows :

On the first day of October, 1883, we promise to pay S. H. Loftin, or order, four hundred dollars, for advances to be made by said Loftin to cultivate a crop for the year 1883.

. To secure the payment of the same, we hereby constitute this a lien on the crop of corn, cotton, rice, wheat and other produce to be raised by us during the year 1883, in Lenoir county.

And for further security we hereby convey to said S. H. Loftin the following articles of personal property: One bay mare, one bay mare mule.

But on this special trust, that if we fail to pay said debt and interest, on or before the 1st day of October, A. D. 1883, then he may sell said property, or so much thereof as may be necessary, by public auction for cash, first giving ten days' notice at three public places, or in some newspaper published in the county,

6

and apply the proceeds of such sale to the discharge of said debt and interest on the same, and costs, and pay any surplus to us.

Given under our hands and seals this 6th day of January, 1883.

S. T. CROSSLAND, [seal].

N. L. HEMBY,    [seal].

*Mr. Geo. V. Strong,* for the plaintiff.
*Mr. R. H. Battle,* for the defendants.

SMITH, C. J. (after stating the facts). The exceptions to be considered on the appeal are to the rulings that,

1. There is no evidence that the defendant, who became himself a party to the lien bond, had authority from the *feme* defendant, his wife, to enter into such obligation or to bind her thereby.

2. Neither any act nor declaration of hers, superinducing the plaintiff's action, estops her from asserting, as owner and lessor of the land, her superior lien upon the crops for rent.

I. There is not only no ground furnished in the testimony to sustain the first exception, but the contrary is shown: Both defendants, on their examination as witnesses, say that the husband had no such authority, and his agency was limited to the renting out of the premises, and, indeed, that the wife herself was present at the making and gave assent to the contract, as made with the lessee when this occurred. The husband states, that at that time, Hemby expressed a wish to have some cotton-seed that were on the premises, when she replied that "she was willing to sell the seed, if he would *pay for them,*" and that the lessee said "he had made arrangements to get his supplies." This arrangement about the advances was made between the plaintiff and the two others, on the same day, afterwards, at Kinston, on the lessee's assurance that he could not obtain the credit, unless the said S. T. Crossland would sign the bond; and this he did, not in the presence of his wife, and with her express disavowal of his authority, as soon as she knew what had been done.

The plaintiff does not himself pretend that he had any communication with the *feme* defendant on the subject, and says that she did not notify him of her dissent to her husband's action, nor does he say that when she was in his store in the Fall, he made any inquiry as to her consent to the terms on which his advances were made. The fact is very apparent, that the plaintiff acted on the belief that the husband owned the land, but it is not shown that the wife did or said anything to create the impression, or that any means were used—not even the husband asked, in whom was the title, to correct that erroneous impression.

II. As to the estoppel.

"A right can only be lost or forfeited," remarks PEARSON, J., in *Devereux* v. *Burgwyn*, 5 Ired. Eq., 351–355, "by such conduct as would make it *fraudulent* and against conscience to assert it. If one acts in such a manner as *intentionally*, [the italics are in the opinion], to make another believe that he has no right, or has abandoned it, and the other, trusting to that belief, does an act which he would otherwise not have done, the fraudulent party will be restrained from asserting his right, unless it be such a case as will admit of compensation in damages. If one stands by, or allows another to buy property to which he has the title, he will not, on account of this fraud, be permitted, in a Court of Equity, to assert his title."

The requisites of an operative estoppel *in pais*, are said by READE, J., in *Holmes* v. *Crowell*, 73 N. C., 613–627, to be these:

1. That the defendant knows of his title.

2. That the plaintiffs did not know, and relied on the defendant's representations.

3. That the plaintiffs were deceived.

And he adds that some authorities require further "that the defendant *intended* to deceive."

The proposition is repeated by SETTLE, J., speaking for the Court in *Exum* v. *Cogdell*, 74 N. C., 139–142.

This is the doctrine applied to transactions in which the actors are *sui juris* and are under no legal incapacities. The rule is

more stringent when to be enforced against a married woman, whose contracts, except as permitted by law, are inoperative, and as they do not bind, do not create an estoppel producing the same result.

We shall not pursue the inquiry, since the subject is examined in the case of *Boyd* v. *Turpin*, delivered at the present term.   Coverture is no protection against responsibility for positive acts of fraud,·or torts, when voluntary and not committed under the coercion, actual or presumed, of the husband. *Burnett* v. *Nicholson*, 86 N. C., 99–105.

But where can be detected any fraud in the *feme* defendant, any false representation in words or conduct, which was intended or even calculated to mislead the plaintiff in making his advances to the lessee?   Her declaration made to him, "I suppose the plaintiff must have his pay first," merely shows her misapprehension of the law in respect to the priority of the conflicting liens—nothing more—as is immediately explained.

The difficulty is, that the plaintiff supposed the husband owned the land, and without inquiring of him or any one else, agreed with the tenant to give him the limited credit, provided the husband would unite with him in executing the bond to create the statutory lien.   It was his own mistake, negligently fallen into, under which he made the advances, and for which the *feme* cannot be held responsible.

The argument here undertook to separate the seal from the instrument, and give it operation as a mere written contract, and convert it into a contract as if made by the wife herself.   In answer to this these suggestions will readily occur to the legal mind :

1. The contract is the personal covenant of the husband and, as such, binds him.

2. If divested of the seal, and we know of no principle upon which this can be done by others than the parties to it, it would remain in form and effect the contract of the same parties.

3. The husband had no authority, nor did he undertake to exercise any, as conferred by his wife, in entering into the contract.

4. All the parties understood it to be his own personal act, and binding him only, as such.

The case in our own court, *Blacknall* v. *Parrish*, 6 Jones' Eq., 70, and the citations from Story's Agency, are not repugnant to the views expressed, nor appropriate to the facts of the present case. In the case referred to, a paper, signed and sealed by the owner of land, with blanks for the name of the bargainee, was placed in the hands of an agent, with parol authority to fill the blanks with the name of the purchaser and price. This he did, and it was held that the instrument, though not operative as a covenant, was operative as a contract within the statute of frauds, and could be specifically enforced. But the contract purported to be that of the principal, and remained unchanged by disregarding the presence of a seal, which was not necessary to give it efficacy. It furnishes no support to the present endeavor to get rid of a seal, rightfully put there by the party himself, and thus not only to change the nature of the instrument, but to make it the contract of another and different person, in opposition to its express terms and to the original understanding of all the parties to it.

We discover no error in the rulings, and the judgment must be affirmed.

*It is so ordered.*

No error.                                        Affirmed.